189        517
205       ¹424
189        517
27 SC    ²427

# Petition of M. S. Quay, R. R. Quay and B. J. Haywood.

*Criminal law—Removal of case into the Supreme Court—Certiorari—Jurisdiction of Supreme Court—Jurisdiction of Superior Court—Practice, Supreme Court.*

The constitution of 1874 did not take away from the Supreme Court the power to remove a criminal case from the court of quarter sessions and send the record thereof to the proper court of another county for trial, or detail one of the justices of the Supreme Court to preside at the trial.

The supervisory power of the Supreme Court over criminal cases should be exercised with extreme caution and only in a clear case; and it must also be exercised in aid of the administration of justice, not to defeat it or needlessly embarrass it.

The supervisory power of the Supreme Court over criminal cases in the quarter sessions does not extend to reviewing the action of the quarter sessions in overruling demurrers to indictments, and in refusing to quash indictments. Such orders are merely interlocutory, and no appeal can be taken from them until after conviction and sentence, and such appeals are, under the Act of June 24, 1895, P. L. 215, exclusively within the jurisdiction of the Superior Court.

The Supreme Court will not remove a criminal case from the court of quarter sessions of Philadelphia county, on the petition of the defendants alleging that they cannot have a fair and impartial trial, where the contention is based merely upon vague charges against two of the lower court judges, one of whom had resigned before the petition was filed, and the other will not be likely to serve again in the quarter sessions until after the case against the defendants had been disposed of.

Argued Jan. 7, 1899. Petition of M. S. Quay, R. R. Quay and Benjamin J. Haywood, for rule to show cause why writ of certiorari should not issue to the court of quarter sessions of Philadelphia, Miscellaneous Docket, No. 1, No. 354. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Petition dismissed.

The petition was as follows :

The petition of Matthew S. Quay, Richard R. Quay and Benjamin J. Haywood respectfully represents that they are under indictment in the court of quarter sessions of the peace of Philadelphia county for various supposed offenses set out in said indictments, as follows : one of said indictments, to wit : No. 328, of November sessions, 1898, charges your petitioner, Matthew S.

Quay, with conspiring with one John S. Hopkins, late cashier of the People's Bank of the city of Philadelphia, to use the moneys of the said bank in the purchase and sale of shares of stock for the benefit and account of him, the said Matthew S. Quay; one of said indictments, to wit: No. 329, of November sessions, 1898, charges your petitioner, Matthew S. Quay, with conspiring with the said John S. Hopkins to buy and sell stock for the account of him, the said Matthew S. Quay, through him, the said John S. Hopkins, who was then cashier of the said People's Bank; one of said indictments, to wit: No. 330, charges all of your petitioners with conspiracy to convert to their own use a portion of the public money of the commonwealth of Pennsylvania; one of said indictments, to wit: No. 331, of November sessions, 1898, charges your petitioners, Matthew S. Quay and Benjamin J. Haywood with conspiring, on the 24th day of March, 1898, with various persons who had respectively held the office of state treasurer of said commonwealth during their respective terms, covering a period of more than twelve years prior to said date, to misappropriate and misuse public moneys of the commonwealth of Pennsylvania, which had been previously deposited in said bank, and thereupon wholly ceased to be public money; one of said indictments, to wit: No. 332, of November sessions, 1898, charges your petitioner, Benjamin J. Haywood, with unlawfully loaning out moneys of the commonwealth and entering into agreements to derive benefit and gains from the deposit of such public moneys of the commonwealth.

No affidavit was made against your petitioner, Benjamin J. Haywood, on said charge, nor was there ever any arrest, hearing or binding over upon said charges.

Your petitioners are absolutely guiltless of each and every supposed offenses, and have neither conspired nor attempted to conspire with any of the persons named in said indictment, nor with any other person or persons, either to misappropriate and misuse the moneys of the People's Bank or the moneys of the commonwealth, or to do any other unlawful act whatever, nor has your petitioner, said Benjamin J. Haywood, loaned out money contrary to law or entered into any agreement or agreements to derive any benefit or gain from the deposit of the same, as is charged in said bill of indictment No. 332.

Your petitioners are advised by counsel, and therefore aver,

that said indictments, Nos. 328, 329, 330 and 331, are absolutely defective in law, in that they fail to set forth any acts which are unlawful or any means which make it appear upon the face of said indictments that they or either of them conspired to do any unlawful act or to use any unlawful means to do any act not in itself unlawful in relation to the matters therein set forth; and that said indictments fail to charge either or any of the said defendants with any offense known to law, · and that by reason of said insufficiency of said indictments no judgment could be entered thereon against them, even if the facts therein alleged could be established by lawful evidence, and that, therefore, said petitioners should not be subjected to the disgrace, expense, hardship and peril of being put upon trial before a jury upon such insufficient indictments.

Your petitioners respectfully pray your honorable court to issue its writ of certiorari to said court of quarter sessions to bring up said indictments in order that your honorable court may deal with the same in such way as will enable them to secure what it is impossible for them to secure in the present position of affairs in the courts in which said indictments are pending, namely, justice and a fair and impartial trial, which is guaranteed to them by the constitution and laws of this commonwealth, and in support of their said prayer, aver as follows:

1. These prosecutions were instigated and inspired chiefly by one James Gay Gordon, late a judge of the court of common pleas, No. 3, of Philadelphia county, acting in concert with other open and avowed political enemies of said Matthew S. Quay; that upon the failure of the People's Bank, about the 24th day of March, 1898, the said James Gay Gordon, although at that time a judge of said court, acted as counsel for one James McManes, president of the said People's Bank, and thus obtained possession of certain letters written by your petitioners relating solely to their own private business transactions, and of certain private memoranda alleged to have been made by one John S. Hopkins, now deceased, formerly cashier of said bank. The said James Gay Gordon had said letters and memoranda copied for the purpose of using them thereafter for political purposes, he (the said James Gay Gordon) being then a candidate for the nomination of the Democratic party for the office of governor of said commonwealth at the election held on the second Tues-

day of November, 1898. Although the said James Gay Gordon had possession of the information contained in said letters and memoranda from about the 24th day of March last, and although said information was from said date also in the possession and knowledge of one Thomas W. Barlow, as receiver of said People's Bank, and as special first assistant district attorney of said county, yet no complaint of any kind whatever was made against your petitioners until about the 3d day of October last, when an affidavit was made upon information and belief by one Meyers, alleged to be a detective in the office of the district attorney of this county, but who failed to appear upon the hearing of said case, upon which warrants were issued charging your petitioners with the offenses aforesaid. Said warrants were issued shortly before the recent state election, which involved the election not only of a governor, but of members of the legislature who will be called upon at their next session to vote for United States senator to succeed the present incumbent, the said Matthew S. Quay, it being then well known that said Matthew S. Quay would be a candidate for re-election to said office. In instigating and procuring the issuing of said warrants said James Gay Gordon was inspired by express and personal malice against the said Matthew S. Quay, as is evidenced by the fact that the said James Gay Gordon publicly charged said Matthew S. Quay with having been largely instrumental in preventing the nomination of him, the said James Gay Gordon, for the office of governor at the Democratic state convention held at Altoona prior to the said election. On or about the 23d day of November, 1898, the said James Gay Gordon resigned from his office as judge.

2. While said indictments were being considered by the grand jury of said county an application was made by the district attorney for attachments against the cashier of a national bank of Allegheny county, and against the cashier of a bank in Beaver, Pa., on the ground that said persons, acting under the advice of the regular counsel of said banks, respectively, declined to bring the books of said banks to the city of Philadelphia for examination. Said application was not made to the judge who had been regularly assigned to hold, and who was then and there holding, the regular court of quarter sessions which then and there had sole jurisdiction over said grand jury, and of all questions

relating to the business and proceedings of said grand jury, but was improperly and irregularly made to the said James Gay Gordon, who was on that day holding a special session of the court of quarter sessions for the trial of bail cases only. Nevertheless, said James Gay Gordon irregularly and improperly heard said application, and peremptorily ordered said witnesses to appear before said grand jury under penalty of an attachment for contempt. A few days later, on Wednesday, the 23d day of November, 1898, your petitioners were notified to appear in court, No. 646, before the said James Gay Gordon, for the purpose of pleading or demurring to the bills of indictment which had been theretofore found against them, although the said James Gay Gordon had not been regularly assigned to hold said court, but by reason of his resignation and retirement from the bench on the day named for the appearance of defendants as aforesaid, said court was without a regularly assigned judge to hear pending cases. On the said 23d day of November, 1898, the Hon. Thomas K. Finletter, president judge of the court of common pleas, No. 3 (of which court the said James Gay Gordon had been theretofore a member), appeared in said court of quarter sessions and proceeded to preside over said court, although he was not the judge who had been duly and regularly assigned to hold said court. One Thomas Finletter, a son of the said Hon. Thomas K. Finletter, was at that time, and had been theretofore, an assistant district attorney of this county, and had been assigned to the duty of taking professional charge of the above indictments in conjunction with the district attorney. On the day last mentioned your petitioners presented to the said court their demurrers to the bills of indictment, Nos. 328, 329, 330 and 331, which demurrers were subsequently overruled by the said Hon. Thomas K. Finletter, who rendered, in connection therewith, the opinion hereto attached. Said opinion was largely based upon the erroneous legal proposition that a person charged with a supposed criminal offense has no right, under the constitution and laws of this commonwealth, to question the sufficiency of an indictment found against him, but must be subjected to the disgrace, expense, inconvenience and peril of a trial before a jury, because after conviction he may possibly be able to successfully raise the question as to the sufficiency of such an indictment upon a motion in

arrest of judgment. In said opinion overruling said demurrers said judge, in commenting upon and condemning the action of your petitioners in filing said demurrers, used language which was wholly uncalled for, and which would naturally be interpreted by the community as an expression of the belief on the part of said judge in the guilt of your petitioners, and which necessarily tended to excite undue prejudice against them in the minds of the people of the community, and thereby to prevent their obtaining a fair and impartial trial. With the said demurrers your petitioner, Benjamin J. Haywood, presented a motion to quash said indictment, No. 332; the said Hon. Thomas K. Finletter in his said opinion, decided that the facts urged in, support of the motion to quash could hereafter be presented in arrest of judgment, and this, notwithstanding the fact that the act of assembly especially provides that all such motions must be made prior to plea pleaded. Immediately after the rendering of said opinion, to wit: on Thursday, December 1, inst., application was made by the district attorney to said judge to fix the earliest possible day for a trial of said defendants, and although said defendants, through their counsel, asked for a reasonable time in which to have an opportunity to have the books and papers of said People's Bank examined by experts, and although, as your petitioners are informed and believed, about two months were required by the experts employed by the district attorney to examine said books and papers, in so far as they related to said transactions referred to in said indictments, said judge peremptorily ordered that the trial of your petitioners should proceed on the Tuesday following, to wit: the 6th day of December, thereby allowing but three working days for an examination of said books and papers, and said judge thereupon then and there publicly stated, in effect, that your petitioners would have all the time to which they were entitled for such examination of said books and papers upon their being produced in court upon the trial of said case. Said order was, however, subsequently modified by said judge, extending the time until Monday, December 12, on account of the engagement of one of petitioners' counsel in the United States Court, thereby allowing your petitioners for said examination of said books and papers but nine working days, notwithstanding the fact, as has been previously averred, that

nearly two months were required by the commonwealth's experts for such examination. While making such examination of said books and papers the experts employed by your petitioners discovered that a large number of checks, notes, bills, papers and memoranda forming part of the records of said People's Bank were missing, and were locked up in the office of the district attorney, and that without an inspection of said papers it was absolutely impossible for them to understand certain entries in the books of said bank relating thereto. Your petitioners, through their counsel, requested an opportunity for such experts to examine said papers in the district attorney's office, and were peremptorily refused such permission. Your petitioners aver that the said refusal by the court to allow them proper time for an investigation and examination of said books and papers, and the said refusal by the said district attorney to permit them to examine said papers in his custody, constitute an absolute denial of justice to them.

3. Your petitioners aver that, by reason of the said action of said James Gay Gordon while he was a judge, and by reason of the said action and decision of the Hon. Thomas K. Finletter, whose affiliation with the said James Gay Gordon is well known, such prejudice has naturally been created in the body of the community against your petitioners that it will be impossible for them to obtain a fair and impartial trial at this time in the said court of quarter sessions for the county of Philadelphia.

4. It is not and never has been pretended by anybody that either the commonwealth of Pennsylvania, or said People's Bank, or any other person ever lost or could have lost one penny by reason of any of the transactions referred to in said indictments, and that in none of said indictments are the defendants or either of them charged with any intent to defraud the said commonwealth, or said People's Bank, or any other person, in any manner whatsoever. Nor were said prosecutions instituted or inspired by any person or persons on behalf of the commonwealth or of said People's Bank, or of any person claiming to have been injured in any way by reason of any of said supposed transactions referred to in said indictments. On the contrary, said prosecutions were instigated solely by said James Gay Gordon, then a judge as aforesaid, and by other open and avowed political enemies of said Matthew S. Quay, and for the sole pur-

pose of unduly influencing and prejudicing the voters of this commonwealth, through such an abuse of the processes of the courts of justice at the general election held in November, 1898, for the election of governor and members of the general assembly. The further prosecution of said indictments is now being unduly pressed, not in the interest of justice, but by a conspiracy of the political enemies of said Matthew S. Quay, for the sole purpose of unduly influencing, prejudicing and intimidating the members of the general assembly in their choice of a successor to said Matthew S. Quay in the senate of the United States; and to said end said conspirators are causing to appear almost daily in the various newspapers of this county libelous, defamatory and malicious comments upon said cases, for the purpose of making it impossible for your petitioners to obtain a fair and impartial trial, and are endeavoring by various unlawful means to secure a disagreement of the jury before which said cases will be tried, if they fail to secure a conviction, so that it is at this time impossible for your petitioners to secure that fair and impartial trial which is guaranteed to them and all other citizens by the constitution and laws of this commonwealth.

5. By reason of the premises, and for the further reason that your petitioner, Matthew S. Quay, is a candidate for the United States senate at the coming session of the general assembly of the state of Pennsylvania, the newspapers of the city of Philadelphia, with possibly one exception, have been daily publishing such inflammatory, scandalous, false, and defamatory statements relative to your petitioners and to the said charges that such undue prejudice has been excited in the public mind that it is impossible for them at this time to secure a fair and impartial trial upon said charges.

Your petitioners therefore pray for a rule to show cause why a writ of certiorari should not be issued by your honorable court, directed to the judges of the court of quarter sessions of the peace for the county of Philadelphia, requiring them to certify the record of said indictments against your petitioners into this Court for such action as shall secure to your petitioners a fair and impartial trial, and further, to assign one of the judges of your honorable court to try the aforesaid indictments; and further, that all proceedings in the said court of quarter sessions be stayed in the mean time.

The following order was made:

" And now, this 9th day of December, 1898, it is ordered that a rule upon the commonwealth of Pennsylvania be served upon the district attorney of the county of Philadelphia, returnable on Saturday, the 7th day of January, 1899, at 11 A. M., to show cause why a writ of certiorari shall not be granted to bring into this Court certain indictments and the proceedings connected therewith now pending in the court of quarter sessions of the peace for the county of Philadelphia, to November sessions, 1898, Nos. 328, 329, 330, 331 and 332. All proceedings in the court of quarter sessions of the peace to stay until further order of the Court.

  " (Signed)  HENRY GREEN,
       " Associate Justice Supreme Court.
    " HENRY W. WILLIAMS,
       " Associate Justice Supreme Court."

George S. Graham, district attorney for the commonwealth of Pennsylvania in and for the city and county of Philadelphia, filed the following answer:

The petitioners are under indictment in the court of quarter sessions of the peace of Philadelphia county for various offenses set out in the indictments referred to in the petition. Said indictments are based upon lawful affidavits and return made by a magistrate, after orderly hearing of evidence in open court, where petitioners and their counsel were present, and in which, with the exception of Benjamin J. Haywood, they took part. The said Haywood was not present at the hearing, but subsequently appeared and waived a hearing. It is not true, as alleged in said petition, with reference to bill No. 332, of November sessions, 1898, that no affidavit was made against the petitioner Benjamin J. Haywood on said charge, and that there was no arrest, hearing or binding over upon said charge. The said indictment was properly presented to the grand jury upon return made by a magistrate in which the making of an affidavit, the preferment of a charge and arrest, hearing and binding over were duly set out, which included the charge made in this particular indictment. All of said indictments were legally and properly found upon the evidence submitted to the grand jury, which found the same true. The allegation that the petition-

ers are absolutely guiltless of said offenses, and that they have
not conspired nor attempted to conspire, as alleged in said in-
dictments, and that the petitioner Haywood did not loan out
money contrary to law or enter into a crime to derive benefit or
gain from the deposit of the same, is no ground for the order
prayed for here, for these are questions that are to be deter-
mined by a jury upon the evidence which shall be submitted to
it upon a trial. The evidence submitted at the hearing before
the magistrate, standing without explanation, clearly established
the guilt of the defendants,.and warranted the finding of all the
indictments referred to.

The allegations of insufficiency of the indictments are mere
renewals of their demurrers, which have been already passed up-
on in an orderly manner, and such allegations are a covert, in-
direct and unlawful method of reviewing the judgment against
the defendants upon said demurrers. The said indictments
were demurred to in the court below, and after argument the
demurrers of the petitioners were overruled and the indict-
ments were adjudged to be sufficient in law and to properly
charge the crimes therein stated. This respondent respectfully
suggests that the judgment upon the demurrers, which was
interlocutory in its character, can be reviewed only when the
case is regularly brought into this Court on appeal, after final
judgment. For this Court to review and pass upon the ques-
tion raised by the demurrers in this extraordinary and unprec-
edented manner would be irregular and greatly prejudicial to
the safe and proper administration of justice. Such a course
is utterly unknown to the law of Pennsylvania.

The allegation in the petition "that it is impossible for the
petitioners to secure, in the present position of affairs in the
courts of Philadelphia, justice and a fair and impartial trial"
is absolutely groundless and untrue. It is mere assertion by
an accused, unsupported by a single allegation of fact that
would warrant so gross an imputation against the integrity of
all the twelve judges of the court of Philadelphia. There is
not a word in the petition that suggests a reason why an im-
partial trial could not be had in the court in which the case
was fixed for trial on Monday, the 12th of December, 1898,
where the Hon. Robert N. Willson is presiding, or before the
Hon. F. A. Brégy, who is now holding a court of quarter ses-

sions in the county of Philadelphia, wherein the cases of the petitioners could be tried. It is a scandalous and unfaithful statement, improvidently made, without citing a single fact to support it. It cannot be pretended that it is the law that a defendant accused of crime can come into court and by his mere assertion impeach the whole administration of justice for the purpose of artfully gaining a delay to serve his private purposes, no matter how weak and insignificant or how great and powerful that defendant may be.

This respondent further makes answer to the "reasons" alleged in support of the prayer of the petitioners.

To the first reason alleged respondent says: It is not true that these prosecutions were inspired by the Hon. James Gay Gordon, acting in concert with other persons. This respondent was first made aware of the testimony upon which these prosecutions were founded on the 2d day of October last. Thereupon respondent demanded the production of the letters and telegrams and other evidences implicating the defendants. Upon examination of the proofs, which are largely documentary, and many of them in the handwriting of the conspirators, respondent believed that it was his duty, under his oath of office, to institute proceedings, and Charles F. Myers, a detective in the district attorney's office, made the necessary affidavit in due and lawful form, whereupon warrants were issued charging the petitioners with the offenses named in the indictments. It was no part of this respondent's duty to know whether state elections were pending which involved the candidacy of one of the defendants, and this respondent is at a loss to see how this averment is material or important in considering whether or not these defendants can have a fair and impartial trial. Neither is it a matter of importance who might have inspired the criminal proceedings, provided those proceedings be well founded in evidence. Respondent solemnly avers that he acted entirely upon his official responsibility, and did what the evidence which he examined required at his hands. The evidence in this case is documentary. The prosecution does not depend upon verbal testimony, but upon the written evidence created by the conspirators themselves in the pursuit of the object of their conspiracy. This evidence shows that the public funds of the commonwealth of Pennsylvania for years have been used by

the conspirators for their private and unlawful gain. Interest has been allowed by the People's Bank on the deposits of public money and paid to the accused, in some cases placed to the individual deposit of the accused in their bank account, and checked out by them along with their own moneys in the same account. In other instances cashier's checks and drafts have been made payable to the accused for certain sums of interest on the public money, and these documents, bearing the indorsement of the accused, showing the receipt by them of the interest money paid, are in existence and in the possession of the commonwealth. The books show that hundreds of thousands of dollars of the public money deposited in the People's Bank were set apart for the use of M. S. Quay and used by him, and that he was charged no interest thereon. The books show that hundreds of thousands of dollars' worth of stocks were bought for the said M. S. Quay with this money; that whenever he failed to use his full allowance of public money thus set apart for him, interest was carefully calculated upon the balance not used by him in the purchase of stocks, and paid to the state treasurer. The district attorney could not have failed or refused to proceed upon this evidence and to bring the accused into court to confess or explain this testimony. This respondent acted without the slightest element of malice, prejudice or feeling. The prosecution is absolutely under the control of your respondent, and no other person. The averment or innuendo that there is any conspiracy to prosecute these defendants is false. Respondent respectfully suggests that if it were true that some one inspired the prosecution, yet if the prosecution itself is just and well founded this can in nowise be a defense for the accused.

Respondent is without personal knowledge as to the allegations concerning James Gay Gordon acting as counsel for one James McManes, president of the People's Bank, but upon information and belief denies that the same is true; but avers that this is an altogether impertinent allegation, and is no ground for the order prayed for. This respondent has no personal knowledge that the said James Gay Gordon obtained possession of letters written by the petitioners referring solely to their own private business transactions, or of private memoranda made by John S. Hopkins, deceased, but avers that if they were private

and related to private business transactions they could have no possible relation to this case. Respondent avers that whether or not the said James Gay Gordon had said letters and memoranda and copied the same is utterly unimportant, irrelevant and impertinent. Whether he made any use of them, politically or otherwise, for his own purposes is utterly aside from this case, and constitutes no ground for the order prayed for in said petition. Upon information and belief respondent avers that it is false and untrue that he made any use of any of the letters, memoranda and papers of the People's Bank, politically or otherwise, for his own purposes. Such allegations on the part of the petitioners are not for the purpose of enlightening the court or aiding in securing the petitioners a fair and impartial trial, but are calculated and intended to divert the attention of every one concerned in the cases from the real issue involved, which is, whether or not Matthew S. Quay and his associate defendants did, by virtue of their political position and power, make use of the public moneys of the commonwealth for their personal gain and advantage, contrary to law. It is utterly unimportant when the information was given to the district attorney, and whether or not the receiver of the People's Bank knew of the existence of incriminating evidence and did not disclose the same until about the 3d of October last, in view of the fact that whatever information, facts, data or letters he held were then submitted by him to the district attorney on the request of the latter, and the proper criminal prosecutions instituted. If delay in bringing the prosecution be material, it can be proved on the trial as a circumstance warranting whatever inference may be legally drawn therefrom; but this respondent suggests that it is utterly immaterial either to the proper hearing and determination of the rule in this case or to the trial of the defendants upon the merits.

This respondent is unaware of any law or obligation of his oath that requires him to take note whether or not an election is pending, and to regulate the beginning or conclusion of criminal prosecutions with reference thereto. If the facts alleged against petitioners be true, then it is a matter of gravest importance to be developed and made known before the election which involves the accused, or any of them. It seems to respondent that of all persons interested in the cause, he who now holds

the high office of senator of the United States, and is a candidate for re-election, should be most anxious to have these matters determined by a jury in a proceeding in open court, where his answer to the accusation, if he has any, could be heard and made known. It cannot be alleged as a fact of which the respondent was bound to take notice that M. S. Quay has chosen to name himself a candidate for re-election to the office he now holds. He is not a candidate nominated by any party, but simply a self-announced aspirant to succeed himself in the senate of the United States, and his ·personal announcement of his candidacy occurred after these proceedings were instituted. Why a legal proceeding should be arrested upon this ground, or the respondent should take notice of this fact, respondent is at a loss to understand, and avers that all allegations to this effect are irrelevant and immaterial.

To the second reason alleged respondent answers : The application by the district attorney for attachments against certain witnesses subpœnaed by the commonwealth was made in the regular way. The witnesses refused to obey the mandate of the court. Any judge could have heard the application for an attachment. The practice for the last eighteen years, to respondent's personal knowledge, and for a long time anterior thereto, has been that the court of quarter sessions, in which bail cases are usually tried, shall devote Friday of each week to the hearing of all motions, rules, etc. The application for the attachments in question was made on a Friday and taken into the court where all rules and motions were heard, in obedience to the practice of the court, and so as not to interrupt the progress of jury trials in the other branch of the quarter sessions court in this county. The proceeding was entirely collateral to the proceeding on the indictments, in the sense that it did not involve the defendants or their counsel in any way. They did not participate in it in any way. Samuel Dickson, Esq., appeared as counsel for the witnesses and made no objection to the hearing before his honor, Judge Gordon, and at the conclusion of the hearing, when the opinion of the judge was delivered, expressed to the judge personally his gratification at the privilege of arguing the question before him, and complimented the judge upon his opinion, written and delivered upon such short notice. Under the constitution and laws of the

commonwealth, every judge of the courts of common pleas has a right to hold a court of quarter sessions and is ex officio a justice of the court of quarter sessions of the peace. For the convenience simply of the several courts, it has been arranged among them by the board of judges that allotments shall be made for the holding of the courts of quarter sessions of this county. By this arrangement the duty of providing judges to sit in these courts is assigned to a particular court of the common pleas; but this assignment does not take away from every other common pleas judge his authority and jurisdiction in the quarter sessions. Judge Gordon could have heard the application whether assigned to try criminal cases or not. The honorable judges of the courts of Allegheny county were assigned to the quarter sessions of that county in 1892, but the chief justice of the Supreme Court had a right to sit, and did sit, to charge the grand jury in the said court in certain cases arising out of the Homestead riots. During the month in question, viz: November, 1898, the board of judges had assigned the duty of supplying the court of quarter sessions in room 646 to court of common pleas, No. 3, of which the Hon. Thomas K. Finletter was president judge and the Hon. James Gay Gordon an associate. That court regularly and properly designated the Hon. James Gay Gordon to hold the court of quarter sessions in room 646 for the month of November, and he was regularly and properly in said court when the motion for attachments against the two witnesses above named was made before him.

Respondent further answers to this reason and says: That early in November, he personally requested the Hon. William W. Wiltbank, one of the judges of court of common pleas, No. 2, to have an assignment, by which that judge held court in room 676, changed so that he might hold the court in 646, and have the Hon. James Gay Gordon, who was holding court in 646, take his place in room 676, in order to relieve the Hon. James Gay Gordon from sitting in room 646, in which certain cases were likely to be called for trial in which he had sat as committing magistrate, and of which he had some personal knowledge; and this was done at the request of the Hon. James Gay Gordon, who notified the district attorney that he did not desire to sit and hear the cases referred to, which included the cases of the

petitioners. The said Hon. William W. Wiltbank agreed to make the exchange, but after conference with the president judge of his court, he subsequently decided to remain in room 676 and conduct the business of the quarter sessions and oyer and terminer therein. Later the resignation of the Hon. James Gay Gordon, which had been theretofore presented to the governor, was accepted, and the Hon. Thomas K. Finletter was obliged in the discharge of his duty as president judge of No. 3, court of common pleas, and in consequence of the vacancy thus created, to appear, and did appear, on the morning that the demurrers were argued, and held the court of quarter sessions in room 646. It is true that notices were out requiring the defendants to appear in court room, No. 646, on November 23, 1898, to plead to the indictments which had been theretofore found against them. That on said day, the Hon. Thomas K. Finletter appeared in said court of quarter sessions to hold said court. This was done by him in fulfilment of the assignment made by the board of judges, which required his court to supply this quarter sessions court with a judge. He was lawfully there, in pursuance of that assignment. It is true that before him the demurrers to the indictments were presented and argued, and subsequently he rendered his decision, overruling the demurrers. The argument of the demurrers occupied almost the entire session of the court for one day, and carefully prepared arguments were submitted on both sides.

Respondent avers that the criticisms upon the opinion are untrue, ill-timed, and cannot be considered in any such proceeding as this. Although the petitioners charge that the language used in the opinion indicated a belief in the guilt of the accused, and was prejudicial to a fair trial, yet they signally fail to point out what language is susceptible of any such interpretation. Respondent respectfully suggests and avers that, as hereinbefore pointed out, the decision of the court upon the demurrers can and ought only to be heard after final judgment, and that the jurisdiction to hear and determine all such questions is exclusively vested in the Superior Court of the state of Pennsylvania, and this tribunal has no jurisdiction whatever over them.

Respondent further avers that, believing that the defendants and their counsel meant what they had so often said, that they desired a speedy hearing and trial, and that the interests of the

public and of justice demanded that they should be heard at the earliest possible moment, this respondent made application for the fixing of an early date of trial. It is not true that the defendants or their counsel asked the court for a reasonable time in which to have the books and papers of the People's Bank examined by experts. No such application was made to the court. The court never refused to allow the defendants time for an investigation and examination of the books and papers of the People's Bank, nor did the district attorney refuse to permit them to examine said books. No demand was ever made upon him by the experts employed by the defendants to see anything except certain checks and drafts which constitute part of the commonwealth's evidence, and which the district attorney refused to permit the expert to see, for the reason, as he then alleged to the expert, that they were not necessary to an understanding of the books, but were sought for on this pretext in order that the defendants might pry into the testimony of the commonwealth and ascertain in what manner these instruments were indorsed.

As to the date fixed for trial, respondent answers and says that it was a date suggested by the defendants' counsel themselves in open court. The district attorney moved for an earlier date, his motion was overruled, and the court of its own motion fixed a date. For the convenience of one of the defendants' counsel, who expected to be professionally engaged in another court, the date named by the court was changed to the date suggested by defendants' counsel, viz: December 12, 1898. The defendants chose their own day for trial. There has been no undue haste in pressing this case for trial. In two weeks they secured three postponements. The crimes charged are the ordinary crimes to conspire to cheat and defraud, and to violate the law by stealing or embezzlement. Any ordinary offender would have been unable to procure the delays which these defendants, by reason of their position and ability to employ skillful counsel to raise technical objections, have obtained. On the date fixed for the entering of pleas, defendants' counsel requested a delay for an hour or two. This was granted without an application to the court. Later they appeared in court and asked the court to give them longer time in which to prepare demurrers. The district attorney suggested the following Fri-

day; the court overruled the district attorney's suggestion, and fixed a later day, to wit: the following Monday, which date was named by the defendants' counsel and adopted by the court. On that Monday, so named, the argument on the demurrers took place as aforesaid, and the decision of the court was rendered on the following Thursday. The decision was so rendered in response to the request of the defendants' counsel, as well as the district attorney, the defendants' counsel stating to the court that they desired an early date fixed for trial. Every continuance asked for by the defendants was granted. Every hearing day thus far in the case has been named by them. Thousands of defendants have been tried upon much shorter notice, and this honorable Court not appealed to to interfere and arrest the progress of their trials. While the commonwealth's experts occupied several weeks in examining the books for evidence, the defendants need no such length of time. The commonwealth required so long a time because it was conducting an investigation of the entire mass of dates and entries contained in the voluminous books of a bank, and this investigation was conducted under conditions, which rendered it extremely laborious and difficult. The commonwealth approached said examination from without, having no previous knowledge of the transactions recited in said books. Its examination was adverse to the bank, and the attitude of the officers and servants of the bank hostile to the investigation. The defendants will and do have no such difficulties. They and the bank officers are familiar with all the transactions in issue, and their previous knowledge will enable the defendants with facility and ease to turn to facts and entries which the commonwealth required days to unearth. The officers and servants of the bank were adverse to the investigation and gave no voluntary aid, whereas the defendants would be confronted with particular items, would know all the history of the transactions to which they referred, and could readily procure from the court any time that might be necessary if an emergency arose requiring additional time in which to produce contradicting evidence, if it existed. This Court should not, it is respectfully suggested, permit the defendants to come before them and practically ask for delay upon alleged inability to examine the books. The petition discloses the fact that they never made any application to the court be-

low either for a bill of particulars or for a continuance of the cause, or for additional time in which to investigate the books. Surely a defendant cannot use the Supreme Court of the state as a means to move for a postponement on such grounds without first having exhausted his remedies in this respect in the inferior court.

To the third reason alleged the respondent comes and says that there is nothing therein contained that requires an answer at his hands. No action of the Hon. James Gay Gordon whilst he was a judge, and nothing in the action and decision of the Hon. Thomas K. Finletter, in connection with the case, has been mentioned in the petition to show how or in what manner prejudice had been created by them in the body of the community against the petitioners. Neither of said judges was to hold the trial of the defendants. The allegation that there is an affiliation between these two judges is not an allegation from which prejudice against the petitioners would spring, and is wholly unmeaning, scandalous, irrelevant and impertinent.

To the fourth reason alleged, respondent says that it cannot be of any importance to this case, and particularly to the hearing of this rule, whether any one has pretended that the commonwealth of Pennsylvania or the People's Bank or any other person has lost one penny by reason of the transactions referred to in the indictments. The indictments themselves charge the defendants with doing and conspiring to do unlawful acts. It is a novel proposition that because a conspiracy has not resulted in a money loss to any one that therefore it ought not to be prosecuted; but the indictments do aver a fraudulent and corrupt conspiracy to do unlawful acts by which loss has actually occured to the commonwealth of Pennsylvania to the People's Bank by the corrupt combinations charged in the indictments. Various large sums of money, amounting in the aggregate to hundreds of thousands of dollars, have been risked and placed in jeopardy by the accused, and large sums of money in the nature of interest have been diverted from the commonwealth's treasury and the funds of the People's Bank into the pockets of the alleged conspirators. A thief cannot set up restitution of stolen goods as a defense to a charge of larceny. Neither can those who have trafficked for their own advantage in the moneys of the commonwealth raised by taxation from the people

say in defense of their illegal acts that because they were able to return the moneys so used that therefore they are not liable for their violation of the law in imperiling these funds in their own transactions and making large profits, gain and interest by the use of them.

Respondent again repeats that this prosecution was not instigated by the said James Gay Gordon and by other open and avowed political enemies of M. S. Quay, and for the sole purpose of unduly influencing and prejudicing the voters of this commonwealth at an election held in November, 1898, for the election of governor and members of the general assembly, but, on the contrary, distinctly asserts that the prosecution was based upon incriminating evidence carefully examined by the district attorney in person, a part of which was produced in evidence before the committing magistrate and before the grand jury, and that the prosecution has no political or other purpose than that of bringing to justice persons whom the respondent verily believes have persistently violated the laws of the commonwealth and used the public moneys of the state as though they were part of their own private property. The allegation that there is a conspiracy of persons who are prosecuting these indictments and that they are being unduly pressed is utterly without foundation, and untruthful. The allegation that any such conspirators are using this prosecution for the purpose of unduly influencing the members of the general assembly in their choice of a successor to Matthew S. Quay in the senate of the United States is also false and untrue.

Respondent also asserts that it is not true that he or any one in his office or connected with the prosecution of this case is inserting any articles in the papers defamatory and malicious or otherwise, affecting these cases, nor is any one seeking to procure a disagreement of the jury before the cases may be tried, unless it be those whose efforts are being put forth in behalf of the defendants and their cases, to debauch the administration of justice and to render partial the jurors who may be selected to try the cases.

Respondent respectfully avers that in seeking trial for these cases he is doing simply his duty under his oath of office, and that in so doing he is not prejudicing and intimidating the general assembly. Such an allegation in itself is preposterous and

unworthy of a place in any legal document. On the contrary, he verily believes that it was his duty to secure a trial of these grave accusations. He avers that it should be to the interest of one holding a high and prominent place in the state service held by Matthew S. Quay, to secure a speedy trial, in order that if the charges against him are not true he might have a full and fair opportunity to disprove them, and not be placed in the unfortunate position of being a candidate for the high office of senator while under indictment.

To the fifth reason assigned respondent answers and says: It is not true that the newspapers of the city of Philadelphia have been daily publishing inflammatory, false, scandalous and defamatory statements relative to the petitioner and affecting these cases. There is no unjust prejudice in the public mind. It is not impossible, but, on the contrary, entirely possible, for these petitioners at this time to secure a fair and impartial trial on the indictments in question.

On a number of occasions the defendants, through their counsel, have urged the speedy trial of these cases. When they were before the committing magistrate, and while the evidence against the defendants was given to the public, they publicly deplored the fact that the cases could not be returned to the then October session of the court of quarter sessions, so that they might be tried at once. Later, in November, in court, on two occasions, while disavowing any intention of delaying the cases by reason of the motions which they made, they went still further, and announced their anxiety to have an early-day fixed for the trial of these cases. There was no suggestion then of any inflamed condition of the public mind, and the conditions then and during the progress of an election might have been better urged than the conditions which have succeeded that election. The publications of the press during the whole progress of these cases up to this point have been signally judicious and free from criticism, with the exception, perhaps, of some which have appeared in the interest of the defendants, in which the statements contained in the petition have been widely promulgated and disseminated to the public.

Respondent avers that appeals of the extraordinary nature of the one made in the petition in question where rules are granted, accompanied with stay of proceedings that interrupt

the regular and orderly progress of the administration of justice in the lower courts, are calculated to do irreparable injury and to make it impossible to successfully prosecute persons of wealth and power who are able to command all that ingenuity, skill and finesse can bring to their aid in escaping the legal consequences of their acts. It is respectfully suggested that the practice in such matters should be at least so far regulated that the same course which prevents the improvident issuance of an injunction in civil cases might be adopted to prevent the summary arrest of a criminal proceeding upon the ex parte statement of interested defendants, unsupported by proofs, and without opportunity to the commonwealth to be heard.

This respondent respectfully submits that the prayer of the petitioner should be refused, and the rule to show cause discharged.

D. T. Watson, for petitioners.—The application must be disposed of, assuming the truths of the averments of the petition: Com. v. Lyon, 4 Dallas, 302; Com. v. Delamater, 145 Pa. 218; Com. v. Smith, 185 Pa. 571; Com. v. Green, 185 Pa. 646; King v. Hunt, 3 Barnewall & Alderson, 444; Rex v. Cowle, 2 Burrows, 834; King v. Eaton, 2 Term Rep. 89; Com. v. Frowenfield, 3 Grant, 99.

If these cases prove what I think they do, (a) that the allegations of fact in the petition are to be taken as true; and (b) that these allegations must only show a doubt or suspicion as to whether a fair trial can be had, a case can be easily proved from the petition itself, where not only a suspicion, a doubt, arises, but where there is overwhelming proof to show that it would be grossly unfair to compel the defendants to go to trial in the quarter sessions of Philadelphia.

To indict Quay for inducing the cashier to buy and sell stocks seems ludicrous: First Nat. Bank v. Gruber, 87 Pa. 470; Merchants' Bank of Easton v. Shouse, 102 Pa. 488.

Evidently after the money was deposited in the People's Bank it was no longer the money of the state. That was a lawful deposit. It was the money of the bank: Foley v. Hill, 2 House of the Lords Cases, 28; Thompson v. Riggs, 5 Wallace, 663; Marine Bank v. Fulton Bank, 2 Wallace, 252.

The Supreme Court still possesses the power to issue writs

of certiorari to inferior tribunals: Com. v. Balph, 111 Pa. 365; Mauch Chunk v. Nescopeck, 21 Pa. 46; Overseers v. Smith, 2 S. & R. 362.

*Rufus E. Shapley*, with him *A. S. L. Shields*, for petitioners.—It is settled law that this Court has full jurisdiction and ample power to grant the petitioners the relief for which they pray, and that the petitioners are entitled to such relief upon proper cause shown: Com. v. Ketner, 92 Pa. 372.

The petition clearly shows that this prosecution was instigated by the express malice of a judge, and through a political conspiracy to abuse the processes of the courts for improper political purposes, and that, in pursuance of said conspiracy, an attempt is now being made to subject the petitioners to the disgrace, inconvenience, hardship, expense and peril of a trial before a jury upon four insufficient indictments which charge no offense known to the law, and to subject one of the defendants to trial upon an indictment irregularly found without any previous affidavit, hearing and binding over according, to law. Therefore, this Court should make said rule absolute, and the writ of certiorari should be granted, and, upon the return of the record, this Court should take such action as will prevent the further prosecution of said indictments, or the trial of the petitioners thereunder: Com. ex rel. v. Ketner, 92 Pa. 372; 2 Hale's Pleas of the Crown, 210; King v. Hube, 5 Term Rep. 542; Com. v. Hunter, 2 Dist. Rep. 707; Com. v. Galbraith & Kerr, 6 Phila. 281; Com. v. Bracken, 14 Phila. 342; Wharton's Criminal Pleading & Practice (8th ed.), sec. 150.

The indictments were insufficient: Rex v. Ring, 7 Q. B. 787; Com. v. Hartmann, 5 Pa. 60; Com. v. Eastman, 1 Cush. 190; State v. Mayberry, 48 Me. 218; State v. Roberts, 34 Me. 320; Lambert v. People, 9 Cow. 578; State v. Parker, 43 N. H. 83; Aldermen v. People, 4 Mich. 414; State v. Jones, 13 Iowa, 269; State v. Younger, 1 Dev. Law (N. C.), 357; State v. Keach, 40 Vt. 113; Fox's App., 93 Pa. 416; Thompson v. Riggs, 5 Wall. 663; Nat. Bank of the Republic v. Millard, 10 Wall. 152; Bank of Northern Liberties v. Jones, 42 Pa. 536; Bank v. King, 57 Pa. 205.

Even if this Court should not be satisfied as to the insufficiency of said indictments, the rule should be made absolute,

and the writ of certiorari should be granted, and, upon the return of the record, the case should be sent for trial to another county, because the petition discloses such exceptional circumstances as render it impossible for the petitioners, at the present time, to secure in this county such a fair and impartial trial as is guaranteed to them by the constitution and laws of this commonwealth: Commonwealth v. Balph, 111 Pa. 365.

*George S. Graham*, with him *T. D. Finletter*, assistant district attorney, and *P. Frederick Rothermel*, district attorney, for the commonwealth.

OPINION BY MR. CHIEF JUSTICE STERRETT, Jan. 10, 1899:

This rule " to show cause why a writ of certiorari should not be granted to bring into this Court certain indictments, and the proceedings connected therewith, now pending in the court of the quarter sessions of the peace for the county of Philadelphia to November sessions, 1898, Nos. 328, 329, 330, 331 and 332," with stay of all proceedings in said court was granted by Justices GREEN and WILLIAMS, in vacation, on December 9, 1898, returnable before the Court in banc on Saturday, January 7, the sixth day of the present term.

On December 19, 1898, the district attorney's answer to the petition and rule was filed; and on January 5 following, the petitioners' replication was filed. On the return day of the rule, the parties appeared by counsel and all the questions alleged to be involved were fully and ably argued.

Our jurisdiction to grant the relief prayed for by the petitioners is challenged by one of the reasons assigned by the district attorney in support of his motion to quash the petition and all proceedings thereunder. That question has been so often considered and decided adversely to the commonwealth's contention that it is unnecessary to consume time in its discussion. We have repeatedly held that when a proper case for the exercise of the supervisory power invoked by these petitioners is presented, it is still our duty to grant relief by sending the record to the proper court of another county for trial or detailing one of our justices to preside at the trial, as the circumstances of each meritorious case may appear to require.

If the writer is not mistaken, the first time, since the present

constitution was adopted, that our jurisdiction was questioned was in Commonwealth v. Rockafeller, Warden et al., argued here in the early part of January, 1880, No. 145, miscellaneous docket, No. 1, of this Court. That, like this, was a rule to show cause why the record of the indictment pending in the court of quarter sessions of Clarion county, charging the defendants with conspiring to unlawfully obstruct and injure the prosecutor and others in the prosecution of their business as producers and transporters of oil, etc. In his answer to the rule the district attorney denied the jurisdiction of this Court, either to send the case to another county for trial, or to otherwise interfere with the case before trial in the court below. The questions involved were ably and elaborately argued, but in February, 1880, before any decision was announced, the matters in controversy were settled, and, on application of both parties, leave was granted to withdraw the petition on which the rule was granted and discontinue the proceedings.

The same question again arose in Commonwealth v. Balph, 111 Pa. 365, and after careful consideration it was decided adversely to the commonwealth's contention. That decision has been reaffirmed in Com. v. Delamater et al., 145 Pa. 210, and Commonwealth v. Smith, 185 Pa. 553. It is unnecessary to here consider the ground upon which the supervisory power in question rests. It is fully discussed and firmly established in the cases above cited.

As to the effect claimed by the learned counsel for the commonwealth for the act of March 18, 1875, what was said by our Brother MITCHELL in the case last cited, at page 566, is a full and complete answer. As was said in Com. v. Balph, and Same v. Delamater, supra, the power referred to should be exercised with extreme caution and only in a clear case. It must also be exercised in aid of the administration of justice, not to defeat it or needlessly embarrass it. The record of our court shows that these principles have never been lost sight of, and it is to be hoped they never will.

We cannot assent to petitioners' contention that it is our duty in this case to review the action of the court below in overruling the demurrers to four of the indictments and refusing to quash the other. We cannot do so without deliberately usurping jurisdiction which we do not possess, and which, in case the

right of appeal hereafter exists, is expressly and exclusively vested in the Superior Court by the 7th section of the Superior Court Act of June 24, 1895, P. L. 215, which declares: " The said court shall have no original jurisdiction, except that it may issue writs of habeas corpus, but it shall have exclusive and final jurisdiction of all appeals which are now allowed to the Supreme Court in the following cases : " (a) All proceedings of any kind in the court of quarter sessions of the peace or before any judge thereof, except cases involving the right to a public office."

The orders overruling the demurrers and refusing to quash are merely interlocutory, and no right of appeal therefrom, to any court, lies until after conviction and sentence. In case of acquittal there will be no necessity for an appeal. Com. v. Ketner, 92 Pa. 372, and kindred cases relied on by the petitioners have no application to this case. That was a habeas corpus granted on the petitioners' averment that he was illegally restrained of his liberty by illegal imprisonment; and the certiorari was merely ancillary to the habeas corpus to bring up the commitment or cause of detention so that the court hearing the habeas corpus could determine whether he was legally deprived of his liberty or not. That, however, is not this case. As was said in Com. v. Green, 185 Pa. 646, " an essential prerequisite to the granting of any such special writ of certiorari is a meritorious and well grounded petition for a habeas corpus. If that is wanting, the certiorari should be refused and the petition therefor dismissed." We are clearly of the opinion that we have no authority whatever in this proceeding to review the action of the court below on the demurrers and motion to quash, and we therefore express no opinion in relation thereto.

The only other contention of the petitioners that requires notice is that they cannot have a fair and impartial trial in the court of quarter sessions of the peace of Philadelphia county where said indictments are still pending on issues of fact raised by their pleas of " not guilty." We cannot assent to this proposition. On the contrary, we are satisfied that the petitioners can and will have a fair and impartial trial in that court before a competent and unprejudiced judge and a fair and impartial jury. If we thought otherwise, we would not hesitate a moment to send the indictments to another jurisdiction for trial.

The learned judges who by virtue of their commissions as judges of the four separate common pleas courts of this county are judges of the courts of oyer and terminer and quarter sessions of the peace, etc., are twelve in number, and sit in said courts in pursuance of previous assignment under the constitutional provision, by which, for example, a judge of common pleas, No. 1, and a judge of common pleas, No. 4 (without designating either of them by name), will be assigned to hold the criminal courts during the next March sessions, and a judge of common pleas, No. 2, and a judge of common pleas, No. 3, will be assigned to hold said courts during next April sessions, and so on throughout the year. The judges of the respective courts from which these assignments are made arrange among themselves as to which of them will go into the criminal courts; and in case of sickness or necessary absence one of the other judges of the court of common pleas from which the assignments are made for that session may take the place of the sick or absent judge, etc. Under this arrangement, the judges who held the criminal courts in November last will probably not be required to sit therein for several months thereafter. Of the twelve judges, who thus in turns hold the criminal courts only two are subjects of complaint in the petition for the rule. One of these resigned his commission and thus severed his connection with common pleas, No. 3, and all the other courts, before the petitioners filed their demurrers and motion to quash. As to what he is alleged to have done while he held his commission it is difficult to say what, if any, effect it may have in preventing or even tending to prevent the petitioners from having a fair and impartial trial before either of the other judges now in commission. The only apparent objections to the other learned judge who rightly took the place of his colleague when the latter resigned, are that he did not dispose of the demurrers and motion to quash in the manner that petitioners claim he should have done, and that he has a son who is a member of the bar and holds a position in the district attorney's office. These objections were uncalled for, and require no comment further than to say that, in his opinion overruling the demurrers and denying the motion to quash, he clearly and fearlessly stated his reasons for so doing, and we see no reason whatever to question his integrity of pur-

pose; and he is too well known and too highly respected in this community and elsewhere to require any vindication at our hands. When the 12th of December was agreed upon as the time for trial of the indictments it was well understood that other judges (one from common pleas, No. 4, and one from common pleas, No. 1) would hold the December sessions of the criminal courts, and that months would probably elapse before it would again come the turn of the learned president of common pleas, No. 3, to serve in said courts. When the petition was presented and rule to show cause, with stay of proceedings, was granted on December 9, 1898, a speedy trial was in prospect on the following Monday before one of the learned judges then holding the criminal courts, against neither of whom was there then or since a breath of complaint; and we have no reason to doubt that fair and impartial juries could then and can now be impaneled for the trial of the several indictments.

Without further reference to other features of the case, our conclusion is that there appears to be no sufficient reason to justify the issuance of a certiorari. The rule to show cause is therefore discharged and the petition is dismissed at the costs of the petitioners.